```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| HERMAN GAINES,<br><br>             Plaintiff,<br><br>     v.<br><br>BRAD BUSNARDO, et al.,<br><br>             Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>   Civil Action<br>No. 13-6566 (JBS-JS)<br><br>**OPINION** |

APPEARANCES:

HERMAN GAINES, Plaintiff Pro Se
429989/233523C
New Jersey State Prison
P.O. BOX 861
Trenton, New Jersey 08625

THOMAS B. REYNOLDS, ESQ.
REYNOLDS & HORN, P.C.
750 Route 73 South, Suite 202A
Marlton, New Jersey 08053
Attorney for Defendants Brad Busnardo and Mary Ellen Green

**SIMANDLE, District Judge:**

**I.  INTRODUCTION**

This matter comes before the Court on Defendants Brad Busnardo and Mary Ellen Green's renewed motion for summary judgment [Docket Item 128]. This Court previously denied Defendants' first motion for summary judgment [Docket Item 33], but Defendants contend that an intervening change in the law governing the standard applicable for an inmate's claim under

the Eighth Amendment based on inadequate medical care compels the opposite conclusion. Under this circumstance, Defendants may properly renew their motion. For the reasons that follow, the Court agrees and will grant Defendants' renewed motion for summary judgment.

## II. BACKGROUND

Plaintiff argues that on September 10, 2011, he suffered a ruptured Achilles tendon while he was a prisoner at the South Woods State Prison ("SWSP"). He states that he informed Defendants Busnardo and Green that he "felt a pop" at the back of his left ankle while playing basketball (see Docket Item 18, Plaintiff's Pretrial Memorandum). Nurse Busnardo and Nurse Green are both Registered Nurses employed at SWSP. Nurse Busnardo first examined Plaintiff at the medical unit on Saturday, September 10 at approximately 11:00 a.m., moments after his basketball injury. Plaintiff claims he was in pain and his ankle was swollen. Nurse Busnardo gave Plaintiff Motrin and an ACE bandage. Plaintiff notes that while Defendants claim they gave him a "brace," the actual item given to him was an ankle "sleeve," that did not provide enough support for him while walking on a ruptured tendon. (Id.) Plaintiff argues that Defendants, "to avoid the workload" deliberately mischaracterized his injury as a sprained ankle; however, Plaintiff believes that Defendants knew that the injury was much

more serious than that. Plaintiff contends that he should be permitted to present his case to a jury to prove that Defendants "lied." (Id.) A few days after his injury, Mr. Gaines was given crutches. He states in his pretrial memorandum that he wanted to procure an expert to "deliver testimony regarding whether Motrin, and ACE bandage, and an ankle sleeve (brace) can address the serious medical need of walking on a ruptured Achilles tendon and also to testify as to the physical ramifications and what occurs when a person bears his weight on a ruptured tendon." (Id.)

The contemporaneous medical record (Exhibits A-I to Certification of Thomas B. Reynolds ("Reynolds Cert.") in Support of Defendants' Renewed Motion for Summary Judgment) reveals the timing and type of medical attention given to Mr. Gaines at the medical facility. Gaines told Busnardo he had left ankle pain from playing basketball when he "twisted it the wrong way." (Id.) On September 10, Nurse Busnardo examined Gaines's ankle and foot and found that Gaines was "able to perform ROM [range of motion] activities but with minor pain." (Id.) Nurse Busnardo stated: "No obvious deformities. No notable swelling seen." (Id.) The situation was assessed as a "Medical Emergency for sprained ankle." (Id.) The record on September 10 also reflects that Mr. Gaines "refused [M]otrin and ice," and that he "just wants ACE wrap," which Nurse Busnardo applied. (Id.) He

3

instructed Gaines to "return to medical if [symptoms] worsen or do not improve." (Id.)

The condition did not improve and Gaines submitted a written health services request form two days later on September 12. (Reynolds Cert., Ex. B.) Gaines continued to experience ankle pain, was "triaged" September 13, 2011, and was seen in the medical facility on September 14, 2011 by Defendant Nurse Green. (Id.) Nurse Green stepped up the medical care, prescribing a five-day supply to Motrin and replacing the ACE bandage with an ankle brace. (Reynolds Cert., Ex. C.) Nurse Green scheduled Gaines for a doctor's care visit and she excused Gaines from performing work or recreational activities. (Id.)

Also, on September 15, a physical therapist provided crutches to Mr. Gaines, which Nurse Green documented on a medical note on September 16. (Reynolds Cert., Ex. D.) Mr. Gaines said he was walking well with the crutches and was aware that he would shortly be seeing the doctor. (Id.)

Next, on Tuesday, September 20, Physician Assistant Avynne Hester evaluated Mr. Gaines and noted he was unable to bear weight on his left ankle, and ordered an ankle x-ray and MRI, to rule out an Achilles tendon injury which she suspected. (Reynolds Cert., Ex. E.) She examined his left lower extremity and noted "no calf pain or gross deformity, pain with plantar flexion, unable to stand on tiptoes, tenderness to palpitation

of Achilles tendon." (Id.) Restrictions on his work and recreation were continued including a restriction to ground floor housing only. (Id.)

The radiological studies were completed and were consistent with an Achilles tendon rupture, and Mr. Gaines was therefore evaluated by an orthopedic specialist, Dr. Gerald Packman. (Reynolds Cert., Ex. F.) Dr. Packman saw Mr. Gaines at his office on October 3, 2011. (Id.) Dr. Packman conducted tests and found "a palpable defect at the Achilles tendon [a] little bit above the insertion into the calcanei," and also administered a "Thompson test" that was "positive for an Achilles rupture on the left." (Id.) He recommended surgery to be done "in no more than about 3 weeks from now." (Id.) Mr. Gaines consented to the surgery (id.), and Dr. Packman would "get him scheduled as soon as possible. (Id.) He prescribed Tylenol No. 3 or tramadol as pain medication. (Id.)

The prison's arrangements for the surgical repair are documented on October 5, and the surgery occurred on October 19, 2011. (Reynolds Cert., Ex. G.) Dr. Packman performed successful surgery to repair the left Achilles tendon, and Mr. Gaines received follow-up care by Dr. Packman and orthopedic specialist Dr. W. Scott Williams (Reynolds Cert., Ex. H) on November 1, 2011 and November 15, 2011. (Id.) Dr. Packman was satisfied with Gaines's post-surgical status as he inspected the incision wound

5

and changed his temporary cast on November 1, and Dr. Williams removed the cast, repositioned the foot, and applied a new short leg cast on November 15. (Id.) The short leg cast was removed on February 14, 2012, and Dr. Williams cleared Gaines to begin physical therapy, including weight bearing as tolerated with crutches. (Id.) Although he missed several physical therapy sessions at the prison, his physical therapy with Robert Capri, PT, continued until April 3, 2012, when Gaines was discharged from therapy. (Reynolds Cert., Ex. H.) There is no evidence that the delay in diagnosing an Achilles tendon rupture complicated the surgical repair or Gaines's recovery and prognosis. This delay is the period from September 10, when Mr. Gaines presented with what was seen as a twisted ankle, and September 20, when Physician Assistant Hester evaluated Mr. Gaines, suspected that he may have a torn Achilles tendon and ordered the radiological diagnostic tests that suggested the Achilles injury.

Defendants' Statement of Material Facts (Docket Item 31-5) reiterates Plaintiff's statements in the Complaint and in answer to interrogatories.[1]

---

[1] In connection with this motion, the Court has reviewed the moving papers and exhibits [Docket Item 128], Plaintiff's Opposition [Docket Item 131], Defendants' Reply of December 9, 2016 [Docket Item 133], Plaintiff's Sur-reply letter of December 15, 2016 [Docket Item 135], and Defendants' further reply letter of December 22, 2016 [Docket Item 136], and finally Plaintiff's letters of December 27, 2016 [Docket Item 139] and January 2, 2017 [Docket Item 138].

With this factual background, the Court next evaluates whether Defendants' motion should be granted.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id. Conclusory, self-serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (internal citations omitted).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or

7

conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

**IV. DISCUSSION**

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Rouse v. Plantier, 183 F.3d 192 (3d Cir. 1999). In order to prevail on an Eighth Amendment medical-needs claim, "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Parkell v. Danberg, 833 F.3d 313, 337 (3d Cir. 2016). As the Third Circuit Court of Appeals recently explained,

> [i]n the Eighth Amendment context, "deliberate indifference" is a subjective standard of liability consistent with recklessness as that term is defined in criminal law. A prison official is deliberately indifferent if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A plaintiff may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk. But the plaintiff must show that the officials were aware of facts from which the inference could be drawn that a substantial risk of harm exists, and that they also drew the inference. It is not enough merely to find

8

> that a reasonable person would have known, or that the defendant should have known.

Id. at 335 (internal citations omitted). A plaintiff cannot succeed on a medical-needs claim where he merely disagrees with the medical treatment provided or where his allegedly inadequate treatment was "a result of an error in medical judgment." Id. at 337 (discussing Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) and Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)). Rather, a medical-needs claim is actionable only where the plaintiff can show that "the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Id. (citing Rouse, 182 F.3d at 197.)

In this case, the undisputed record before the Court shows that Defendants' failure to provide Plaintiff with crutches and instead to treat his ankle injury at first with Motrin, bandages, and a brace does not rise to the level of actionable deliberate indifference. Plaintiff presented to the medical clinic on September 10 with symptoms of an ankle sprain, and he described his injury as a twisted ankle for which he received treatment and follow-up care. There is no indication until September 20 that his injury was possibly a ruptured Achilles

9

tendon, which is the date Physician Assistant Avynne Hester ordered the ankle x-ray and MRI to rule out Achilles rupture, as noted above. While Nurse Busnardo and Nurse Green did not realize what they thought was an ankle sprain was actually a ruptured Achilles tendon, there is no evidence that their medical perceptions and treatment were the result of indifference or refusal to do what was medically necessary for the condition they saw in the first few days of treatment.

First, Plaintiff has adduced no admissible evidence that Defendants ignored his medical needs and intentionally refused to provide treatment. <u>Parkell</u>, 833 F. 3d at 337 (citing <u>Rouse</u>, 182 F.3d at 197.) Plaintiff's speculation that the Defendants knew immediately that his injury was to his Achilles and not an ankle sprain is not supported by any admissible testimony or document in the record and does not alone create a triable dispute of fact over whether Defendants recognized and ignored the extent of his injury. In this case, Plaintiff's claims, and Defendants' responses, are quite similar to those found not actionable against a nurse in <u>Parkell</u>. There, the plaintiff claimed that the nurse "never properly examined his injury in person even though he had a 'massive infection' and that she should have given him medication for pain," but the Third Circuit determined that, because the nurse ordered an x-ray that showed normal results and offered over-the-counter pain

10

medication, "a factfinder could not reasonably conclude that [the nurse] deliberately ignored risks to [the plaintiff's] health." Parkell, 833 F.3d at 337-38. Likewise, here, Plaintiff claims that he was in "severe pain" and his ankle was swollen, but it is undisputed that Defendants Busnardo and Green perceived his injury as a twisted ankle and offered Plaintiff over-the-counter pain medications, bandages, and a brace; ordered that Plaintiff refrain from work and recreation; confirmed a medical order for crutches; and arranged for Plaintiff to see a doctor. (See Chart Notes [Ex. A to Reynolds Cert. (September 10, 2011), Ex. C (September 14, 2011), and Ex. D. (September 16, 2011)].)

Like the nurse in Parkell, who noted that the plaintiff's x-ray results came back normal, Nurse Busnardo examined Plaintiff's ankle on the day of the accident, conducted a range of motion test on the joint, and noted "no obvious deformities" and "no notable swelling" in his medical record. (Ex. A.) Also, like the other medical professionals in Parkell who subsequently examined the plaintiff, Nurse Green offered additional treatment and scheduled Plaintiff for an appointment with a doctor when it became apparent that Plaintiff's condition had not improved. (Ex. C & D.) It would be unreasonable for a jury to conclude, from these actions, that the Defendants intentionally ignored Plaintiff's medical needs. Despite Plaintiff's disagreement that

11

he immediately should have been provided additional treatment in the form of crutches, there is nothing in the record to suggest that either of these Defendants ignored Plaintiff's medical needs and intentionally refused to provide adequate treatment. After all, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners" and a plaintiff cannot succeed on a medical-needs claim where he merely disagrees with the medical treatment provided. Parkell, 833 F.3d at 337.

Second, Plaintiff has pointed to nothing in the record, beyond his own speculation, that Defendants delayed or denied Plaintiff treatment for non-medical reasons. Parkell, 833 F. 3d at 337 (citing Rouse, 182 F.3d at 197.) Plaintiff posits that Defendants decided not to provide him with crutches as a cost-saving measure, in order to avoid "acknowledgment and admission that the injury was serious," but points to no evidence in the record supporting his theory. (Plaintiff's Opposition to Summary Judgment [Docket Item 131] at 12.) Indeed, Plaintiff's speculation that Defendants "covered up" the extent of his injury in order to save money is contradicted by the actual medical record, which indicates that Defendants Busnardo and Green instructed Plaintiff to return for a follow-up if his symptoms worsened, and scheduled Plaintiff for a doctor's call when his physical exam a few days later showed deterioration of

his ankle's condition. Indeed, the record is uncontradicted that as Mr. Gaines's medical condition persisted, Nurse Busnardo and Nurse Green intensified their efforts, which was the opposite of exhibiting deliberate indifference to his needs. "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010); Sterling Nat'l Mortg. Co. v. Mortg. Corner, Inc., 97 F.3d 39, 44 (3d Cir. 1996) (stating that "[m]ere speculation about the possibility of the existence of such facts" does not raise triable issue to defeat motion for summary judgment).

Finally, Plaintiff has not shown that Defendants prevented Plaintiff from receiving necessary medical care, despite his conclusory assertion to the contrary. Parkell, 833 F. 3d at 337 (citing Rouse, 182 F.3d at 197.) The record shows that Defendant Busnardo attended to Plaintiff on the day of his injury and instructed him to come back to the clinic if his condition did not improve, that Defendant Green scheduled Plaintiff for a doctor's call after her first examination of Plaintiff's ankle, just days after his injury, and that shortly thereafter Plaintiff was examined by Physician Assistant Avynne Hester and Dr. William Briglia, DO, and was referred to Dr. Gerald Packman, an orthopedic specialist. (See Chart Notes from 9/14/2011 [Ex. C]; from 9/16/2011 [Ex. D]; from 9/20/2011 [Ex. E]; and

13

10/3/2011 [Ex. E].) No rational factfinder could determine that this series of events constitutes preventing Plaintiff from receiving medical care.[2]

Accordingly, where the undisputed record shows that Plaintiff received medical care from Defendants for an ankle injury, and in the absence of any indication that Defendants intentionally ignored Plaintiff's injury, acted for non-medical reasons, or prevented Plaintiff from receiving necessary medical care, no rational jury could conclude as a matter of law that Defendants acted with deliberate indifference with respect to Plaintiff's medical needs. Defendants' renewed motion for summary judgment will be granted.

---

[2] In addressing this Eighth Amendment claim, Defendants Busnardo and Green need not demonstrate that they rendered perfect medical care or even optimal care. An Eighth Amendment claim for deliberate indifference to serious medical needs requires proof of more than medical malpractice, which may be defined as a negligent deviation from the prevailing standard of medical care; "mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). Even if a medical provider's judgment concerning the proper course of treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice, not an Eighth Amendment violation. See Estelle, 429 U.S. at 105-106; White, 897 F.2d at 110. Thus, in the present case, disputes about whether Nurse Busnardo and Nurse Green should have more quickly diagnosed and treated Mr. Gaines's Achilles tendon rupture are not material in the absence of evidence showing they were deliberately indifferent to his medical needs. Indeed, such questions are not material to any claim in the present case, given that the Court previously granted Defendants' motion for summary judgment on Plaintiff's state law medical malpractice claim. (See Docket Item 33 at 5-8.)

## V. CONCLUSION

For the reasons stated above, Defendants' renewed motion for summary judgment is granted. An accompanying Order will be entered.

**June 5, 2017**　　　　　　　　　　　　　　**s/ Jerome B. Simandle**
Date　　　　　　　　　　　　　　　　　　　JEROME B. SIMANDLE
　　　　　　　　　　　　　　　　　　　　　U.S. District Judge